(No. 11487.—Judgment affirmed.)

The Cedar Rapids and Iowa City Railway and Light Company, Appellant, *vs.* The Sprague Electric Company, Appellee.

*Opinion filed October 23, 1917.*

1. Damages—*party injured by breach of contract must attempt to reduce his damages.* It is the duty of a party injured by a breach of contract to do all that is reasonably in his power to prevent the damage or reduce it to the smallest amount.

2. Negligence—*when purchaser cannot rely upon manufacturer's guaranty against defects to indemnify him for damages paid to third person.* A party may not recklessly use defective machinery, with full knowledge of its dangerous condition, to the injury of third persons and rely upon the manufacturer's guaranty against defects for indemnity against liability for his own negligence.

3. Guaranty—*when a purchaser of guaranteed machinery can not recover indemnity.* A purchaser of guaranteed machinery who operates the same for several months with knowledge of a dangerous defect, and knowing that the seller is relying upon him to remedy the defect in accordance with directions given by the seller when the defect was called to his attention, cannot recover indemnity from the seller for damages which the purchaser was obliged to pay for a fatal injury to an employee caused by operating the machinery in its defective condition.

Appeal from the First Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. Lockwood Honore, Judge, presiding.

MOSES, ROSENTHAL & KENNEDY, (HENRY H. KENNEDY, and S. SIDNEY STEIN, of counsel,) for appellant.

CUMMINS, ROEMER, FLYNN, MILKEWITCH & MCKENNA, for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

The appellee, the Sprague Electric Company, entered into a contract with the appellant, the Cedar Rapids and Iowa City Railway and Light Company, for a consideration of $10,992, to furnish, deliver and erect on foundations to be furnished by the railway and light company certain apparatus and equipment known as a monorail electric shovel and runway, being an overhead tramway and the equipment for carrying coal from railway cars to the furnaces of the appellant's light and power plant in the city of Cedar Rapids, Iowa. The contract contained the following provision: "The company guarantees the apparatus and equipment covered by this agreement to be free from imperfections in their manufacture for a period of one year from date of invoice. Should any such defects appear within that time traceable to above causes the company will repair or replace such defective parts if an inspection proves the claim. This guaranty also covers the runway beam against rolling, curling or buckling, due to operation of monorail on its lower flange." The structure was about 700 feet long and 30 feet high, consisting of a series of upright beams with cross-beams resting upon them. The electric hoist and carrying apparatus were suspended from the lower flange of a series of I-beams placed end to end, the whole referred to as the runway beam. This runway beam extended the whole length of the structure and was suspended from the lower side of the cross-beams, to which it was fastened by means of brackets, which were small pieces of angle-iron riveted to the bottom of the upper flange of the runway and to the cross-beam above. There were

twenty-six of these rivets to each pair of brackets, and the weight of the runway beam, and the hoist which it carried, rested upon the brackets. One end of one of the I-beams which constituted the runway adjoined a movable switch and was not supported by brackets but only by four three-quarter-inch rivets, though the opposite end was fastened by four brackets. The date of the invoice of the apparatus so erected was December 9, 1909. On October 31, 1910, while Fred Duncan was operating the apparatus for the appellant, the end of the I-beam which was not supported by brackets gave way and Duncan was thrown down and killed. His administratrix sued the appellant in Iowa and recovered a judgment for $6000 and costs, which the appellant paid. Thereupon the appellant brought a suit in assumpsit upon the contract in the circuit court of Cook county against the appellee to recover the amount it had been so compelled to pay, together with its attorneys' fees in defending the suit. At the conclusion of the evidence each party moved for a directed verdict. The court sustained the motion of the appellant and directed a verdict in its favor for $6717.40,—the amount of the judgment and attorneys' fees,—and a judgment was rendered against the appellee for that amount. On appeal by the defendant the Appellate Court for the First District reversed the judgment and granted a certificate of importance and appeal to the railway and light company.

There is no material controversy about the facts. The electrical hoist and carrying apparatus weighed 13,000 pounds, had attached an operator's cage of structural steel which hung from the hoist and had a capacity of 2000 pounds, so that its weight, when loaded, was 15,000 pounds. The negligence charged in constructing the apparatus was in failing to supply the necessary number of supports and bolts to safely carry the hoist. Soon after the apparatus was put in operation the heads of the rivets began to break off at the point where there was no bracket, and from time

to time the appellant replaced them, and after several weeks substituted four three-quarter-inch bolts for the four three-quarter-inch rivets. This did not remedy the defect, for the bolts also broke off and they were replaced several times by the appellant. On April 11 Rowlands, a representative of the appellee, was at the appellant's plant and his attention was called to this condition. Rowlands told Duncan, who was the operator of the electrical hoist, that it was very dangerous to operate the car over the rail in that condition and that the best thing to do would be to have a bracket made to hold the I-beams to the cross-beams. He told Ford, who was an employee of the appellant in charge of the boiler department, that he had better have a bracket made to support that part of the runway,—that it was dangerous to operate the car over it in its present condition,— and told him how the bracket should be made. It could have been made by the appellant there in its own blacksmith shop at a cost of five or six dollars. Green, who was the superintendent of the plant, was not there at the time, but Martin, his assistant, was. Rowlands and Ford talked to Martin about the bracket, and he either said that he would have it attended to or would take it up with Green on his return. Upon his return the matter was taken up with Green but he gave no directions to have the matter attended to, saying that it was up to the Sprague Electric Company to fix that and that Ford should not do it, and therefore no bracket was made. No notice was given to the appellee, but the appellant continued to operate the apparatus in its dangerous condition for more than six months longer, until the accident which resulted in Duncan's death.

By its guaranty the electric company warranted the apparatus to be free from imperfection in manufacture, but the apparatus was not free from imperfection in manufacture. That the absence of the bracket at the place in question was a defect which produced a dangerous condition was recognized both by the appellant and the appellee, and

under its guaranty it was the duty of the electric company to replace the defective part. It did not do so, but, having notice of the dangerous condition, informed the appellant how it could be corrected, and the appellant had notice that the appellee was relying upon the appellant's correcting the defect. The appellant knew that the operation of the apparatus in its defective condition was dangerous to the lives of its employees, and with this knowledge for six months it continued to operate the apparatus without making any effort to repair the defect. It insists that it had a right to rely upon the appellee's guaranty of the freedom of the apparatus from imperfection, and that the appellee is liable to it for the consequent damages resulting from the imperfection without regard to the conduct of the appellant in continuing its use with knowledge of its dangerous condition. Whatever might be the liability of the appellee, under its guaranty, for an injury caused to third persons, whether through the negligence of the appellant or without its negligence, it is a general rule of law that it is the duty of a party injured by a breach of contract to do all that is reasonably in his power to prevent the damage or reduce it to the smallest amount. A party may not recklessly use a defective instrument with full knowledge of its dangerous condition, to the injury of third persons, relying upon the guaranty of its condition for indemnity against liability for his own negligence. If the defect were not apparent, or even if it were discoverable by an inspection but was not discovered through the negligent failure to inspect, an entirely different question would be presented from that arising here. Here is a known dangerous condition likely to result in loss of life and great pecuniary damage. Under such circumstances the purchaser is not justified, either in law or morals, in exposing the lives and property of others to the risk of using defective apparatus. The parties never had in contemplation in entering into the agreement that the purchaser should willfully use the apparatus in a mani-

festly dangerous condition, and if it did so it has no right to call upon the seller to answer for the damages occasioned by its wrongful act.

Sutherland, in his work on Damages, says (sec. 88) : "The law imposes upon a party injured from another's breach of contract or tort the active duty of making reasonable exertions to render the injury as light as possible. If by his negligence or willfulness he allows the damages to be unnecessarily enhanced, the increased loss,—that which was avoidable by the performance of his duty,—falls upon him.   This is a practical duty under a great variety of circumstances, and as the damages which are suffered by a failure to perform it are not recoverable, it is a duty of great importance.   Where it exists, the labor or expense which its performance involves is chargeable to the party liable for the injury thus mitigated.   In other words, the reasonable cost of the measures which the injured party is bound to take to lessen the damages, whether adopted or not, will measure the compensation the party injured can recover for the injury, or the part of the injury that such measures have or would have prevented."   This text is sustained by a large number of decisions cited in the notes. Many other decisions are cited in 15 R. C. L. 442, where it is announced as a fundamental rule that a person who is exposed to injury by another's wrong or negligence, whether tortious or through the breach of a contract, must use reasonable care and diligence to avoid loss or minimize the damages, and that so far as the damages result from his failure to use such care and diligence he cannot recover. The person seeking to recover damages caused by a defective construction of property is required to use reasonable efforts to protect himself from loss, and can only recover such damages as he could not have avoided by the exercise of reasonable diligence.   (13 Cyc. 76; 1 Sedgwick on Damages,—9th ed.—chap. 10; *Peck* v. *Chicago Railways Co.* 270 Ill. 34; *Toledo, Peoria and Warsaw Railway Co.* v. *Pindar,*

53 id. 447; *Brant* v. *Gallup,* 111 id. 487; *Frick Co.* v. *Falk,* 50 Kan. 644.)   Among the illustrations of the application of the doctrine given by Sutherland are an action for damages from defects in the construction of a building so that the roof leaked and injured the interior, or for breach of a contract to repair a building resulting in similar injuries, or for injury to crops due to the defendant's neglect to build or repair a fence.   In such cases, where the party suffering from the injury is aware of the fact and the cause and by a little effort and expense may avoid the damage, the law imposes upon him the duty to do so and confines his recovery of damages to compensation for the necessary and proper means of prevention, when, in view of all the circumstances of the particular case, it is a reasonable duty which he ought to perform instead of passively allowing a greater damage.   This principle was clearly applicable to the present case.   The duty of the appellee arose out of its contract.   The appellant was informed of the means necessary to remedy the dangerous condition of the runway and prevent the danger which that condition made imminent.   It knew that the appellee was relying upon its making the repairs, which it could have done at a trifling expense.   It was in possession of the property and in a favorable situation for making the repairs.   It ought to have made the repairs or notified the appellee to do so and ceased the use of the dangerous machinery until the repairs were made.   Its failure to do so was the proximate cause of the accident, and it cannot hold the appellee responsible for the consequences of its neglect.

Under the undisputed testimony there was no evidence which would warrant a verdict for the plaintiff, and the circuit court therefore erred in directing a verdict for the plaintiff and in refusing to direct a verdict for defendant.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*